**In re the Honorable John O'BIER, a Judicial Officer.**

**No. 3, 2002.**

Court on the Judiciary of Delaware.

Submitted: Aug. 5, 2003.
Decided: Nov. 6, 2003.

Daniel V. Folt, of Duane Morris, Wilmington, for Judicial Officer.

David A. Boswell, of Rehoboth Beach, appointed as Presenting Counsel.

Before VEASEY, Chief Justice, HOLLAND, BERGER, STEELE and JACOBS, Justices, CHANDLER, Chancellor and RIDGELY, President Judge, constituting the Court on the Judiciary.

PER CURIAM:

In this proceeding that brings a judicial officer before the Court on the Judiciary pursuant to the Delaware Constitution, we conclude that the judicial officer committed wilful and persistent misconduct that violated the Delaware Judges' Code of Judicial Conduct. For that misconduct we conclude that he must be sanctioned. We further conclude that the judicial officer suffers from a disability that must be adequately treated before he may be permitted to return to his judicial duties.

## THE CONSTITUTION AND APPLICABLE CODE PROVISION

Article IV, Section 37, of the Delaware Constitution confers authority on the Court on the Judiciary to discipline a judge for:

wilful misconduct in office, wilful and persistent failure to perform his or her duties, the commission after appointment of an offense involving moral turpitude, or other persistent misconduct in violation of the Canons of Judicial Ethics as adopted by the Delaware Supreme Court from time to time.

[Moreover, a] judicial officer may be retired by virtue of this section for permanent mental or physical disability interfering with the proper performance of the duties of his or her office.

Canon 2 of the Delaware Judges' Code of Judicial Conduct is implicated in this matter. It provides in pertinent part that "[a] judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The Comment to Canon 2 provides that:

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety.

\* \* \*

The test for appearance of impropriety is whether the conduct would create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired. A judge does not violate this Code merely because a personal or judicial decision of the judge may be erroneous.

## PROCEDURAL BACKGROUND

The judicial officer in this proceeding is the Honorable John O'Bier, a magistrate of the Justice of the Peace Court in Sussex County, Delaware. Judge O'Bier was appointed to his position in January 1989 and has been reappointed twice. His term expires in March 2004. Judge O'Bier currently is on paid administrative leave pending the outcome of this proceeding.

The Honorable Patricia W. Griffin, Chief Magistrate of the Justice of the Peace Court, filed a complaint in the Court on the Judiciary. The complaint alleged that Judge O'Bier (i) mishandled a gun in the presence of court staff; (ii) conducted court while in a confused and disoriented state of mind; and (iii) appeared confused, disoriented and not in a condition to work.

The Court on the Judiciary designated a Panel of the Preliminary Investigatory Committee to investigate the matters identified in the complaint and thereafter to submit a report determining whether or not there is probable cause to believe that the judicial officer may be subject to sanction under the Constitution. The Panel filed a report finding that probable cause existed to believe that Judge O'Bier (i) "displayed his weapon before the Clerks in a fashion that made them feel their personal safety was in question," (ii) "was confused and disoriented while conducting his court," and (iii) "was not in a condition to work as a Justice of the Peace because of this disorientation and confused condition." Moreover, the Panel concluded that "probable cause does exist regarding the competency of Judge O'Bier to fulfill his judicial duties and whether that competency is impaired by medical and/or physical problems and/or the use of medication."

The Court on the Judiciary appointed Superior Court Judge Carl Goldstein as the Board of Examining Officer. In turn,

the Board appointed David A. Boswell, Esquire, as presenting counsel to conduct an investigation and to present evidence to the Board on the formal charges.[1] The Board held a four-day evidentiary hearing, and thereafter directed Judge O'Bier and presenting counsel to submit proposed findings of fact and conclusions of law, along with recommendations for disposition of this matter.

The Board issued a final report finding that Judge O'Bier's conduct in drawing his firearm before court personnel on one occasion and, on other occasions, displaying his firearm in public view, constituted wilful and persistent misconduct that violated Canon 2 of the Delaware Judges' Code of Judicial Conduct. The Board recommended a three-month suspension without pay, a public reprimand, and a permanent ban on carrying or displaying a weapon while on court premises. On the remaining two charges concerning Judge O'Bier's confused state of mind and disorientation, the Board concluded that there was no evidence of wilful misconduct or persistent failure to perform duties and no evidence upon which to conclude that Judge O'Bier was incompetent "to fulfill judicial duties due to impairment by his medical and/or physical problems and/or the use of medication." The Board recommended, however, that Judge O'Bier continue treatment for existing medical conditions, be evaluated for any substance abuse problem and follow medical treatment recommendations. Moreover, the Board recommended that Judge O'Bier's medical and treatment providers report periodically to the Chief Magistrate as to Judge O'Bier's compliance with the conditions and his abilities to perform his duties.

Presenting Counsel filed exceptions to the Board's report. Judge O'Bier did not file exceptions. Thereafter, this Court ordered briefing, and the matter was heard upon oral argument.

## FACTS

In January 2002, Judge O'Bier began working midnight to 8 a.m. shifts, "the graveyard shifts," at J.P. Court No. 3 in Georgetown, Delaware. Previously, he had worked primarily the day shift at J.P. Court No. 4 in Seaford, Delaware. He agreed to try permanent overnight shifts, however, because he wanted to work four days on and four days off, a feature of the graveyard shifts, and because he wanted to assist the other judges at J.P. Court No. 3, none of whom wanted to work that shift. Moreover, because Judge O'Bier had difficulty sleeping at night, he reasoned that working the graveyard shift might help him sleep during the day.

Judge O'Bier began the first graveyard shift on January 11, 2002, and worked the following three days. After four days off, Judge O'Bier went back to work at midnight on January 19, 2002, to start another four shifts. It is Judge O'Bier's behavior during this time period, specifically January 19 to January 22, 2002, that was the focus of the initial complaint against him and the subsequent investigation into his conduct.

### Judicial Officer's Display of Weapon

The record reflects that Judge O'Bier normally carried a firearm with him to work as a magistrate. According to Deputy Chief Magistrate Sheila Blakely, the practice of magistrates carrying weapons at work began in the 1960s in response to

**1.** The Court expresses its gratitude to Mr. Boswell for his professional services rendered *pro bono publico*. The Court also expresses its view that his services and those of Daniel V. Folt, Esquire, counsel for respondent, were in the highest tradition of the Delaware Bar.

their concerns about the lack of court security.

In January 2002, there was no written policy in the Justice of the Peace Court system governing the circumstances under which magistrates are authorized to carry weapons.[2] The record is clear, however, that over the years Judge O'Bier's supervisors and fellow magistrates had to remind him several times that he was required to lock his gun away or to keep it out of sight if he was carrying it. Nonetheless, the record reflects that he persisted in displaying his weapon both on his desk in chambers and on his person.

A few minutes before midnight on January 21, 2002, Judge O'Bier relieved another magistrate and began his 12:00 a.m. to 8:00 a.m. shift on January 22, 2002. At the same time, Denise Baker, a court clerk, was ending her own shift, and Kathy Carlisle, another court clerk, relieved Baker.

Both Carlisle and Baker testified that Judge O'Bier was normally pleasant, friendly and easy-going, but on that morning he was out of sorts. According to Carlisle, Judge O'Bier seemed to be in pain, complained about the severe pain he had experienced since his most recent back surgery, and was upset about what he claimed had been a long-standing problem he had with Chief Magistrate Griffin and Deputy Chief Magistrate Blakely.[3] Baker described Judge O'Bier as uncharacteristically "on edge" and "intense." She recounted that he talked about how he had been mistreated in the hospital[4] and about an incident in the news where a boy's father had gotten beaten to death at a sporting event.

At approximately 12:15 a.m., Baker was standing at the back door of the administrative office of the court preparing to leave. Carlisle was seated at her desk several feet away from Baker. Judge O'Bier was standing in front of Carlisle's desk. There are major discrepancies in the testimony of Baker, Carlisle and Judge O'Bier about what happened next.

Carlisle testified that she could not recall the gist of the conversation at the time or to whom he was speaking, but that Judge O'Bier, during the course of a conversation, rapidly pulled his gun out of his holster and pointed the barrel approximately two feet to the side of Baker. Carlisle said that she was surprised by the incident, and that Baker was very frightened.

In testifying about the same incident, Baker recalled that Judge O'Bier was talk-

---

**2.** While we recognize that budgetary restraints have challenged court security in the Justice of the Peace Courts, we urge the General Assembly to provide adequate appropriations so that court security can be made available in the Justice of the Peace Courts during all hours of operation, thus obviating the perceived need of some magistrates to have firearms available. Meanwhile, we are aware that the Justice of the Peace Court administration is currently reviewing a firearm policy in view of policies recently established for other courts and courthouses. If the Justice of the Peace Court administration deems it imperative that magistrates carry concealed weapons on judicial duty until adequate funding is available to provide court security during all shifts of operation, we urge the court to promulgate an official written policy that sets forth specific guidelines defining when, where and under what circumstances magistrates are authorized to carry those weapons.

**3.** The record includes numerous references to Judge O'Bier's belief that he was the subject of a vendetta and retaliatory treatment by Chief Magistrate Griffin and Deputy Chief Magistrate Blakely. Judge O'Bier disavowed the so-called vendetta at the Board hearing, and we find no evidence to support these references.

**4.** The record reflects that Judge O'Bier was traumatized by an incident at Johns Hopkins when he was forcibly intubated without being sufficiently anesthetized.

ing non-stop and in an agitated manner about the beating incident in the news when he suddenly drew his weapon, pointed it a couple of feet to her left, and then immediately returned the gun to its holster. Baker testified that, when Judge O'Bier pointed his gun near her, she "yelped" in fear. According to Baker, she remained inside for a few minutes because she was afraid to leave Carlisle alone with Judge O'Bier. Baker then went to her car where she sat for a few minutes trying to decide whether or not to call Carlisle to make sure that she was okay and whether to call the police to report the incident.

In stark contrast to Baker's testimony, Judge O'Bier testified that he was neither excited nor angry when he drew his weapon in the presence of Baker and Carlisle. Instead, he explained, he slowly and calmly removed his gun from his holster with one hand and displayed it in the palm of his other hand, possibly in response to Carlisle's question about gun safety. Judge O'Bier testified that he did not intend to frighten Baker and Carlisle, and that he was not aware that he had frightened Baker. Nonetheless, he recognized in hindsight that he had made a mistake in judgment when he removed his weapon, and he testified that he was remorseful about the incident.

### Judicial Officer's Disorientation and Confused Condition at Work

Several witnesses, including other magistrates, court personnel in addition to Carlisle and Baker, and two police officers who appeared in court before Judge O'Bier, testified that his behavior was abnormal on January 19 through January 22, 2002. For example, Casey Glatfelter, a court clerk, testified that while at work on January 19, 2002, Judge O'Bier slurred his speech, was sluggish, lethargic, worked slowly, was confused or disoriented, and was not himself.

Delaware State Police Corporal Rick Deskis, who had never previously appeared before Judge O'Bier, testified that, on January 19, 2002, Judge O'Bier was "odd," "not right," and ranted inappropriately and irrationally at an arraignment. Corporal Deskis testified that he was so concerned about Judge O'Bier's behavior that, after he left the courthouse, he telephoned the court clerk "to make sure everything was okay." Delaware State Police Sergeant Charles Caldwell, who had previously appeared before Judge O'Bier over fifty times, observed, during this same arraignment, a major change in Judge O'Bier's behavior, including repeated rambling, disjointed comments and a change in speech patterns.[5] Sergeant Caldwell testified that he believed that Judge O'Bier was on medication.

Because of their concern about Judge O'Bier's unusual behavior at the arraignment, both Corporal Deskis and Sergeant Caldwell made it a point to watch a video arraignment conducted by Judge O'Bier later that morning. According to Sergeant Caldwell, Judge O'Bier behaved "better" at the video arraignment. Corporal Deskis stated even more emphatically that Judge O'Bier's later behavior was much better, "like night and day."

Judge William Hopkins testified that Judge O'Bier's eyes were glassy, and that he appeared dazed, disoriented, confused, and "in no condition to work" on January 19 or 21, 2002.[6] Judge Hopkins testified

---

**5.** Sergeant Caldwell's deposition transcript of August 1, 2002, was admitted into evidence in lieu of live testimony.

**6.** The record reflects that Judge Hopkins relieved Judge O'Bier at midnight on January 19 and 21, 2002. Judge Hopkins was unable

that, on the morning in question, Judge O'Bier "was not in control of his faculties like he normally is," rambled, was "beside himself," and seemed preoccupied with the grievance he had against Chief Magistrate Griffin and Deputy Chief Magistrate Blakely. Judge Hopkins surmised that Judge O'Bier was under the influence of drugs. He confronted Judge O'Bier with his suspicions and even offered to accompany him to California to the Betty Ford Clinic to address the drug problem that Judge Hopkins suspected. When asked on direct examination whether Judge Hopkins had confronted him about a suspected drug problem on January 19 or 21, 2002, Judge O'Bier replied that he could not recall the conversation.

Finally, Judge Jeni Coffelt, a close friend and colleague of Judge O'Bier, testified that, when she relieved Judge O'Bier on January 20, 2002, she observed that he was lethargic, slurred his speech and "repeated things over and over." Judge Coffelt testified that Judge O'Bier "was impaired that morning to the point where [she] didn't feel comfortable having a discussion with him" because she "didn't think he would comprehend what [she] had to say to him."

Judge Coffelt testified that she suspected that Judge O'Bier's impairment was due to medication, specifically methadone. She recalled that, in a closed door session with him the following morning at the shift change, she told him in no uncertain terms that "some of the officers might perceive him to be more intoxicated or impaired" than some of the defendants who were coming before him. Judge Coffelt urged Judge O'Bier "to address this aggressively

with his physician." On direct examination, Judge O'Bier recalled talking to Judge Coffelt that morning, but he did not remember any details of the conversation.

Judge Coffelt also testified that she observed a prescription pill bottle on Judge O'Bier's desk when she relieved him on January 20. Judge Coffelt recalled that the prescription label was dated 1999 and was authorized by a dentist in Seaford. She could not recall the name of the medication, and she did not open the bottle to look inside.

Judge O'Bier denied that he took any medication at work during that period of time, except perhaps a non-prescription vitamin, antacid or aspirin that he had a habit of carrying in an old prescription bottle.[7] Moreover, Judge O'Bier denied that the unusual incidents recounted by the witnesses were caused by his use of any narcotic medication.

Judge O'Bier testified that he was "extremely tired and exhausted" during the four graveyard shifts from January 19 through 22, 2002. Indeed, he estimated that he got only an hour of sleep before reporting to work on January 19, 20 and 21, and maybe two to three hours of sleep before reporting to work on January 22, 2002.

In addition to his sleep problems, Judge O'Bier recalled that during this period of time he was struggling with a crisis in his personal relationship. According to Judge O'Bier, he spent January 18, 2002, the day before the January 19 graveyard shift, moving out of the house that he shared with his long-term girlfriend, Sherri Ben-

___

to recall on which of the two nights he observed Judge O'Bier in an impaired condition.

7. Casey Glatfelter testified that she observed Judge O'Bier taking medication while at work on January 19, and that, on January 20, he

stated that he was getting medication from his truck. Judge O'Bier admitted that he may have taken a pill while at work on January 19, but if he did, it was a non-prescription medication.

son. Judge O'Bier testified that he and Benson were both upset about the move, and that, as a result of the upheaval in his personal life, he was distracted and anxious when he reported to work on January 19.

### Judicial Officer's Restless Leg Syndrome and Chronic Sleep Deprivation

Judge O'Bier has suffered from restless leg syndrome since his youth. It first affected his sleep in the early 1970s and has grown progressively worse in the ensuing years. When he was first officially diagnosed with restless leg syndrome in 1994, Judge O'Bier was sleeping between one and four hours each night. Unfortunately, as the condition worsened over the years, he got less and less sleep. By the second set of graveyard shifts in January 2002, he admitted that he had lost control of his sleep problem and was getting, at the most, one to two hours of sleep each night and no sleep at all on some nights.

Judge O'Bier's primary care physician, Dr. Kenneth Smith, diagnosed his restless leg syndrome and testified on Judge O'Bier's behalf at the hearing. Dr. Smith prescribed medications, but they gave Judge O'Bier no lasting relief, and the condition continued to grow worse over time. In 1999, Dr. Smith referred Judge O'Bier to a neurologist, Dr. Bruce Doppler. Dr. Doppler experimented with a variety of medications in an effort to improve Judge O'Bier's condition. The medications helped for only a brief period of time, however. His condition regressed, persisted and continued to worsen.

In February 2002, having not resolved Judge O'Bier's restless leg syndrome and sleep-related difficulties, Dr. Doppler referred him to Dr. Katrin Andreasson at Johns Hopkins. Dr. Andreasson examined Judge O'Bier and issued a report with new recommendations. Dr. Smith began prescribing a new schedule of combination medications as suggested by Dr. Andreasson.

All of the doctors who evaluated Judge O'Bier agreed that he suffers from a long-term and extremely serious case of restless leg syndrome with chronic sleep deprivation. Both Dr. Smith and Dr. John B. Townsend, III, a neurologist who evaluated Judge O'Bier for the hearing and reviewed his medical records, opined that working back-to-back graveyard shifts would have caused a significant negative impact on his already fragile sleep pattern. Moreover, both Dr. Smith and Dr. Townsend opined that Judge O'Bier's restless leg syndrome-induced sleep deprivation, in combination with the move to permanent graveyard shifts, together likely caused Judge O'Bier's unusual behavior that others reported during the period in question.

### Judicial Officer's Use of Pain Medications

The record reflects that, in addition to restless leg syndrome and chronic sleep deprivation, Judge O'Bier suffers from chronic back pain. Despite two back surgeries in 2000, he continues to experience daily back pain that he described as "moderate" at its best and, at times, "severe."

Judge O'Bier was prescribed powerful narcotic medications, including methadone, oxycontin and oxycodone, to treat post and pre-surgical back pain. A prescription history exhibit used at the Board hearing reflects that he was prescribed methadone for a period of time ending in January 2001, and oxycontin and oxycodone for periods ending in December 2001.

Judge O'Bier testified that the last time he took oxycontin was in November 2001, and that he has not possessed methadone since April 2001. Moreover, he testified that, despite his problems with pain, he did

not like taking pain medications, and that he did not take all of the oxycontin that was prescribed for him, and he took none of the oxycodone.

The record does not entirely support Judge O'Bier's testimony that he has not used oxycontin since November 2001. For example, Judge Coffelt testified that when she confronted Judge O'Bier on January 20 with her suspicions that he was using methadone, he told her that he was not taking methadone, he was taking oxycontin. Moreover, medical records admitted into evidence suggest that Judge O'Bier may have reported to Dr. Smith on January 21, 2002, that he was taking oxycontin.

Both Dr. Smith and Dr. Townsend testified, however, that given the limited amount of medication taken by Judge O'Bier and from their observations of him, they did not believe that he was addicted to or abusing drugs. Moreover, a report from the Sussex County Counseling Services stated that Judge O'Bier was evaluated for substance abuse on February 12, 2002. The evaluation data did not support substance abuse treatment at that time, and the urine screen was "negative for non-prescribed drugs and alcohol."

### BOARD'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### Display of Weapon

The Board found that "Judge O'Bier displayed a weapon in a fashion that the two court clerks in his presence felt that their personal safety was threatened," and that such behavior was wilful misconduct. The Board also found that "Judge O'Bier's persistence in carrying his weapon on his person while at work in such a way that the weapon was clearly visible to the public and employees constitute[d] wilful misconduct." The Board concluded that

Judge O'Bier's mishandling of his weapon violated Canon 2 of the Delaware Judges' Code of Judicial Conduct "by creating the perception that his ability to carry out his judicial responsibilities with integrity, impartiality and competence was impaired."

#### Judicial Officer's Disorientation and Confused Condition at Work

The Board concluded that the evidence presented at the hearing failed to show by clear and convincing evidence that "Judge O'Bier's behavior as alleged during the relevant time period constituted wilful misconduct or persistent failure to perform his duties so as to create a reasonable perception that his ability to carry out his judicial responsibilities with integrity, impartiality and competence was impaired." The Board found it particularly persuasive that "no witness testified that Judge O'Bier, despite acting in an unusual manner, was unfit to perform his job duties or that he did not perform them in a satisfactory manner."

The Board further found that the evidence presented did not reveal that "Judge O'Bier suffered from a drug addiction or that his competency was affected due to the use of medication." Rather, the Board found that "Judge O'Bier's behavior resulted from a severe lack of sleep resulting from his diagnosed restless leg syndrome combined with the change in his work hours. In addition, Judge O'Bier was suffering a personal crisis that caused him emotional upset and distraction."

### STANDARD OF REVIEW

■ The final report of the Board has the force and effect of a master's report in the Court of Chancery.[8] This Court is not

---

8. *In re Rowe,* 566 A.2d 1001, 1005 (Del.Jud.  1989).

required to adopt the recommendation of the Board.[9] Rather, "[t]his Court is obligated to conduct its own evaluation of the evidence adduced by the Board and reach an independent conclusion as to the sanctions to be imposed."[10] The ultimate responsibility to censure, remove or retire any judicial officer appointed by the Governor is entrusted to this Court.[11]

■ Judicial misconduct or disability must be proved by clear and convincing evidence.[12] Clear and convincing evidence is a higher evidentiary standard than mere preponderance, but a lesser standard than proof beyond a reasonable doubt.[13] Clear and convincing evidence is best described as evidence that produces in the mind of the trier of fact "an abiding conviction that the truth of [the] factual contentions are 'highly probable.' "[14]

### Display of Weapon

■ We have independently reviewed the record and conclude that the Board's findings of fact and conclusions of law as to the display of weapon charge are supported by clear and convincing evidence. Our review of the record leads us to conclude that Judge O'Bier's mishandling of his weapon on January 22, 2002, demonstrated, as the Board found, "gross unconcern for his conduct and for the safety of others in the vicinity" and thus constituted wilful misconduct. Moreover, we agree that Judge O'Bier's persistence in carrying and displaying his weapon while at work in such a way that the weapon was clearly visible to the public and employees, constituted wilful misconduct. Furthermore, we agree that such persistent misconduct violated Canon 2 of the Judges' Code of Judicial Conduct.

### Judicial Officer's Disorientation and Confused Condition at Work

■ Having carefully reviewed the record, we agree with the Board that Judge O'Bier's conduct that led to the charges that he was confused and disoriented and in no condition to work, did not rise to the level of wilful misconduct. "[W]ilful misconduct as used in art. IV § 37 of the Delaware Constitution includes the improper or wrongful use of the power of his/her office by a judge acting intentionally, knowingly, voluntarily, or with gross unconcern for his conduct, which would bring the judicial office into disrepute."[15] We conclude that Judge O'Bier did not, when he elected to report to work while in a severely sleep-deprived condition that precipitated debilitating behaviors, engage in "the improper or wrongful use of the power of his/her office." Moreover, under the circumstances of this case, we conclude that Judge O'Bier did not, either in reporting to work while sleep-deprived or in remaining at work while he was reportedly impaired, act "intentionally, knowingly, voluntarily, or with gross unconcern for his conduct."

Furthermore, we agree with the Board that Judge O'Bier's actions were neither

---

9. *Id.*

10. *Id.* at 1006.

11. Del. Const. art. IV, § 37.

12. *In re Rowe*, 566 A.2d at 1006; Ct. Jud. R. 13(g).

13. *Id.*

14. *Id.* (quoting *Kaszuk v. Bakery and Confectionary Union*, 638 F.Supp. 365, 374 (N.D.Ill. 1984)).

15. *In re Rowe*, 566 A.2d at 1006.

persistent failure to perform duties nor were they persistent misconduct in violation of the Delaware Judges' Code of Judicial Conduct. It is undisputed that the allegations of confused and disoriented behavior were uncharacteristic of Judge O'Bier and occurred only during three consecutive shifts out of a twelve year career. We find, for this reason, that his decisions to report to work while severely sleep-deprived during the shifts in question, as well as the ensuing impairments that were noted by others who worked with him, were isolated and anomalous incidents that did not rise to the level of actionable persistent misconduct.

Finally, we agree with the Board that Judge O'Bier was not shown by clear and convincing evidence to be incompetent to fulfill his judicial duties due to impairment by a medical problem.[16] Notwithstanding our finding as to Judge O'Bier's competence, however, we find that the evidence disclosed in the record overwhelmingly supports a finding that Judge O'Bier suffers from a judicial disability.

A judicial disability exists whenever a physical or mental impairment significantly interferes with the capacity of a judge to perform judicial functions or duties.[17] In this case, the evidence leaves no doubt that during the period from January 19 to January 22, 2002, Judge O'Bier was overwhelmed by a disability, i.e., chronic sleep deprivation, that was likely exacerbated by the change in his schedule and a personal crisis unfolding at the time. Also, it is clear that this disability significantly interfered with Judge O'Bier's ability to carry out the duties of his office.

## THE APPROPRIATE SANCTION

After consideration of the arguments and evidence presented in this case, we uphold the Board's report and find that Judge O'Bier's inappropriate display of his weapon constituted wilful and persistent misconduct in office. We adopt the Board's recommended sanction of a three-month suspension, a public reprimand, and a permanent ban on Judge O'Bier from carrying or displaying a weapon at work.

Moreover, we agree with the Board that there is significant evidence in the record to raise legitimate concerns about Judge O'Bier's current and future mental and physical status. Indeed, we conclude that the record supports a finding that Judge O'Bier suffers from a judicial disability that is likely to be remediable. Therefore, the Court agrees with the Board's recommendations, as modified below. Accordingly, Judge O'Bier will be suspended for three months for misconduct involving the firearm. Thereafter, he may be restored to judicial duties only after he has demonstrated fitness to return to judicial office.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The report of the Board of Examining Officers is confirmed and approved, except as otherwise provided.

2. Effective on this date, Judge O'Bier is suspended from his judicial office for wilful and persistent misconduct

---

**16.** "[W]hen incompetency is alleged the Court's task is to determine whether the conduct at issue establishes that the [judicial officer] lacks the requisite ability, knowledge, judgment, or diligence to consistent and capably discharge the duties of the office he or she holds." *In re Baber,* 847 S.W.2d 800, 803 (Mo.1993).

**17.** American Judicature Society, Guidelines for Cases Involving Judicial Disability, No. 1 (1985).

in connection with the weapon misuse.

3. This suspension is for a period of three months, without salary, benefits or other compensation.

4. Judge O'Bier must continue regular treatment for existing medical conditions, including the treatment offered by Dr. Townsend,[18] during the period of suspension.

5. Judge O'Bier must be evaluated for any substance abuse problem and follow treatment recommendations by a competent specialist.

6. Judge O'Bier must be evaluated for any sleep disorder problem and follow treatment recommendations by a competent specialist.

7. Judge O'Bier's medical and treatment providers must report to the Chief Magistrate on or before the end of the three-month suspension as to his compliance with these conditions and his ability to perform his duties.

8. At the conclusion of his three-month suspension, Judge O'Bier shall not resume his judicial duties until he has been adequately treated and has demonstrated his fitness to return to his position as a judicial officer, as determined by his medical and treatment providers, to the satisfaction of the Chief Magistrate.

9. Nevertheless, salary and benefits shall be restored after the three months original suspension until further Order of this Court.

10. Judge O'Bier shall not resume his judicial duties beyond the suspension period of three months until the conditions of the preceding paragraphs have been met, and such compliance and Judge O'Bier's ability to resume judicial duties shall have been determined and certified to the Clerk of this Court by the Chief Magistrate of the Justice of the Peace Court.

11. The publication of this Opinion will constitute public censure.[19]

12. A certified copy of this Opinion shall be transmitted to the Governor, the State Treasurer, and to the Chief Magistrate of the Justice of the Peace Court.

13. Jurisdiction is retained for the purpose of receiving the certification of the Chief Magistrate as provided in paragraph 10 and evaluating whether further proceedings by this Court shall be required or this proceeding terminated, in connection with Judge O'Bier's current and presumptively remediable judicial disability.

---

**18.** The record reflects that Dr. Townsend expressed a willingness to accept responsibility for managing and directly treating Judge O'Bier's restless leg syndrome, implementing a treatment plan, and providing periodic reports to the Chief Magistrate certifying Judge O'Bier's ability to work as a magistrate.

**19.** Confidentiality does not apply to an order of suspension. *See* Ct. Jud. R. 17.